[No. B224034. Second Dist., Div. Four. Nov. 16, 2011.]

MARCELA FUENTES, Plaintiff and Respondent, v.
AUTOZONE, INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication with the exception of parts I, II, and IV of the Discussion.

**COUNSEL**

Littler Mendelson and Gregg C. Sindici for Defendant and Appellant.

Rastegar & Matern, Matthew J. Matern, Paul J. Weiner, Sandra M. Falchetti; Pine & Pine and Norman Pine for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, P. J.**—AutoZone, Inc. (AutoZone), challenges a judgment against it in an action for sexual harassment brought by its former employee, Marcela Fuentes. It claims that critical portions of Fuentes's testimony were inherently improbable, and that the evidence of sexual harassment was insufficient. AutoZone also challenges as excessive the attorney fees awarded to Fuentes and her counsel.

In the published portion of this decision, we reject AutoZone's claim that Fuentes's testimony was improbable and find that substantial evidence supports the jury's verdict. In the unpublished portions of the opinion, we decline to find that AutoZone waived its challenge to the sufficiency of the evidence by presenting a slanted and incomplete discussion of the trial evidence. We also reject Fuentes's claim that the doctrine of law of the case precludes AutoZone from challenging the sufficiency of the evidence to support the verdict. Finding no error, we affirm the award of attorney fees.

## FACTUAL AND PROCEDURAL SUMMARY

This is the second time this matter is before us. In an unpublished opinion, *Fuentes v. AutoZone, Inc.* (Sept. 10, 2007, B185659) (nonpub. opn.) (*Fuentes I*), we reversed an award of summary judgment in favor of AutoZone and remanded. Following a jury trial, Fuentes was awarded $160,000 in damages, $23,898.76 in costs, and $677,025 in statutory attorney fees.

AutoZone sells auto parts. Fuentes, who was 21 years old, worked as a part-time customer service representative (cashier) for AutoZone at the Florence and Normandie store beginning in December 2002. The store manager was Juan Vaca, the assistant store manager was Melvin Garcia, and Gonzalo Carrillo was one of the parts sales managers. Garcia became acting store manager on May 16, 2003, when Vaca went on leave. The relevant events occurred from May 16, 2003, to June 19, 2003, while Vaca was away and Garcia was acting manager of the store.

Fuentes's testimony related several incidents of inappropriate behavior and comments by Garcia and Carrillo. These included spreading rumors that she

had sexually transmitted herpes and that she and a coworker, Ricardo Jimenez, were engaged in a sexual relationship; and suggesting that she could make more money working as a stripper or being photographed for a magazine in a bikini. In one incident, Garcia physically moved Fuentes to turn her around and display her buttocks to customers, while he was laughing and clapping. He did this in order to sell more AutoZone merchandise. Later the same day, when two of the regular customers who had witnessed the first turning incident returned to the store, Garcia told Fuentes to be ready to turn around again for them. Fuentes refused. Garcia also told Fuentes that if he and she owned the store, they could be rich because all she had to do "was just turn around and show them [her] butt."

Fuentes complained to Carrillo about Garcia's conduct. Carrillo reported it to Edward Beltran, the district manager. In a telephone conversation with Beltran, Fuentes described the incidents. She asked for and received a transfer to another store. The other store was not as convenient for her because she did not have a car and had walked to work at the Normandie store. The last day Fuentes worked at the Normandie store was June 19, 2003.

After she was transferred to another store, Fuentes met with Ricardo Bonilla, a district manager for AutoZone. She told him she had issues at the Normandie store and felt no one was looking into the situation. He called the corporate office and put her on the telephone with someone from human resources. Fuentes was placed on administrative leave while her complaints were investigated. Garcia and Carrillo were transferred from the Normandie store and were later terminated on August 9, 2003. Fuentes continued to work for AutoZone until 2005, when she left voluntarily for reasons unrelated to this lawsuit.

Fuentes sued AutoZone, Garcia, and Carrillo after receiving right-to-sue letters from the Department of Fair Employment and Housing. She alleged causes of action for sexual harassment in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), intentional infliction of emotional distress, and slander. The trial court granted summary judgment to defendants. We found triable issues of material fact on the cause of action for sexual harassment and reversed the judgment in our unpublished opinion in *Fuentes I*. We affirmed summary adjudication on the causes of action for intentional infliction of emotional distress and slander.

The case was tried to a jury. The jury returned a special verdict, finding unanimously that Fuentes was subjected to unwanted conduct by Garcia because of her gender; that his conduct was severe or pervasive; that a reasonable woman in Fuentes's circumstances would have considered the work environment to be sexually hostile or abusive; that Fuentes considered

the work environment to be sexually hostile or abusive; that Garcia's conduct was a substantial factor in causing harm to Fuentes; and that he was a supervisor for AutoZone. The jury reached the same unanimous findings about Carrillo's conduct. Fuentes was awarded $160,000 in damages as a result of the sexually harassing conduct by Garcia and Carrillo. The jury found that Garcia and Carrillo each were responsible for 50 percent of Fuentes's damages. Since AutoZone was strictly liable for the conduct of its supervisors, Garcia and Carrillo, the entire judgment was awarded against it. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034 [6 Cal.Rptr.3d 441, 79 P.3d 556].)

AutoZone's motion for judgment notwithstanding the verdict was denied by the trial court. Fuentes moved for an award of attorney fees pursuant to Government Code section 12900 et seq. She was awarded fees of $677,025 and costs of $23,898.76. We consolidated AutoZone's appeals from the judgment and the fee award.[1]

## DISCUSSION

### I, II[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

 California law prohibits sexual harassment in the workplace. (Gov. Code, § 12940, subd. (j)(1).) This case involves the hostile environment theory of sexual harassment. Fuentes had the burden of showing "that the harassing conduct was 'severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex.' [Citations.] There is no recovery 'for harassment that is occasional, isolated, sporadic, or trivial.' [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043 [95 Cal.Rptr.3d 636, 209 P.3d 963] (*Hughes*).) The test for hostile environment sexual harassment has both objective and subjective elements: " '[t]o be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive . . . ." ' Therefore, 'a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail . . . if a reasonable person . . . , *considering all the circumstances*, would not share the same perception.' [Citation.]" (*Id.* at p. 1044, italics added.)

---

[1] Garcia and Carrillo are not parties to these appeals.

[*]See footnote, *ante*, page 1221.

■ AutoZone's challenge to the sufficiency of the evidence treats each incident or comment in isolation. It ignores the requirement that we consider the totality of the circumstances. This is contrary to the applicable law, as we explained in *Fuentes I.* "[T]he existence of a hostile work environment depends upon 'the totality of the circumstances.' [Citation.]" (*Hughes, supra,* 46 Cal.4th at p. 1044.) " '[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' (*Harris v. Forklift Systems, Inc.*[ (1993)] 510 U.S. [17,] 23 [126 L.Ed.2d 295, 114 S.Ct. 367].)" (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 [30 Cal.Rptr.3d 797, 115 P.3d 77].) We turn to an examination of the evidence of harassment presented at trial.[2]

A. *Humiliating Fuentes by Exploiting Her Body*

Fuentes was a cashier. She testified that one day she was ringing up some customers when Garcia approached, grabbed her hand and pushed her back to spin her around. He said " 'Show your butt to the customers and that way you can sell more. This is how you do WITTDTJR.' " WITTDTJR is the acronym for " 'What it takes to do the job right.' " Fuentes learned in training that the term refers to an AutoZone program geared to sell more items to customers. About five customers were present, including two whom Fuentes recognized as regular customers who came in nearly every day. The customers laughed and giggled in response to Garcia's action. One of them moved his hips as if he was dancing. Garcia told the customers in Spanish: " 'Tell her you want to see her,' " referring to Fuentes. Garcia also was laughing, clapping, and moving his hips. Fuentes walked away, but was called back by Garcia to finish the transaction with the customer.

Later the same day, two of the same customers who were present during the first incident returned to the store. As they were walking toward the parts counter, Garcia told Fuentes " 'Get ready for them.' He's like, 'Get ready to turn around again for them.' " Fuentes said, "No." One of the customers laughed. This time, Garcia did not touch Fuentes or spin her around. Fuentes was uncomfortable and embarrassed. She told Guadalupe Garcia, another employee, about the incident and said she felt embarrassed. On another occasion, Melvin Garcia told Fuentes that if she and he owned the store, they "would be rich" because all Fuentes had to do "was turn around and show them [her] butt."

---

[2] Excerpts of the depositions of Garcia, Carrillo, and Guadalupe Garcia were read to the jury at trial as the testimony of unavailable witnesses. The parties lodged the deposition transcripts on appeal with a stipulation identifying the portions read to the jury.

Excerpts of the deposition of Guadalupe Garcia were read at trial because she was unavailable. She recounted one incident at the cash register when Garcia told Fuentes in Spanish to turn around, but said that Garcia did not touch Fuentes to effect the turn. She said Fuentes did not turn. According to Guadalupe Garcia, the customers were laughing during this incident.

Carrillo testified at deposition that Guadalupe Garcia told him about the incident in which Melvin Garcia made Fuentes show her buttocks to the customers. This was after Fuentes had complained to him about Melvin Garcia's behavior. Carrillo was asked whether Fuentes told him that Garcia had taken her hand to turn her around. He answered: "If I recall correctly, she did, and she did it in the form of a gesture. She gestured to [Carrillo] that he had approached her and said, 'Come on, turn around,' like sticking her hand in the air above her head so she would stick her hand up and turn." She said the customers cheered her on. Carrillo could not recall whether Fuentes said Garcia physically made her turn around, but he remembered that she said people started taunting her and cheering her on. While reporting this incident to him, Fuentes was upset and angry. Carrillo described her eyes as teary and her face as flushed.

B. *Herpes Rumor*

Fuentes developed a fever blister on her lip over the 2003 Memorial Day weekend. She called in sick on Monday, May 26, but was told to come in to work. She worked a brief time before being sent home ill. Fuentes returned to work the next day, May 27. She noticed Garcia staring at the blister on her lip and looking at her coworker, Jennifer Arguelles. Arguelles told Fuentes: " 'Hey, Marcela, Melvin [Garcia] is saying that you have herpes.' " Arguelles reported that Garcia said: " 'Look out for Marcela when she comes to work so you can see her lip, her blister.' " This was the first reference to herpes Fuentes had heard.

Fuentes confronted Garcia about his statements and he denied making them, blaming Arguelles instead. She and Arguelles went together to Garcia who first said he would talk about it later but then said he did not want to talk about it. Fuentes testified that Garcia told them if they brought up the subject again, he would write both of them up and would fire Fuentes.

Arguelles corroborated Fuentes's testimony that the two women confronted Garcia about the herpes rumor. Arguelles said that Garcia's face turned red, but he did not deny the rumor. He told them to get back to work. Carrillo did not discuss the herpes rumor with her. Guadalupe Garcia also testified that she heard the rumor that Fuentes had herpes, but did not recall who said it.

Four coworkers told Fuentes they had heard the herpes rumor. Veronica Hernandez, who worked in another department at the store, asked Fuentes

whether she had heard that people were saying she had herpes. Fuentes was upset and told Ulises Monsivais, a commercial manager at the Normandie AutoZone store, that she could not believe that these managers were saying such things about her. Monsivais told Fuentes she should report it to Vaca when he returned. Fuentes also testified that she heard the herpes rumor about herself from Jesus, an employee at another AutoZone store. Jesus called the store and Fuentes answered the call. He asked if he was speaking to Fuentes, and then said that he " 'heard you look nice but that you have herpes, that you're the girl with the herpes. One of the managers told me.' " Jesus would not identify which supervisor told him Fuentes had herpes.

Later Fuentes again confronted Garcia about his statement that she had herpes. He denied making the statement, said he did not want to talk about it again, and that he would fire her if she brought it up again. Garcia told Fuentes he had a photograph of her kissing coworker Ricardo Jimenez and would use that as grounds to fire her.[3] Fuentes said that was impossible because she and Jimenez were not involved in a relationship at that time. Fuentes testified this incident occurred on May 27, 2003.

Ulises Monsivais testified that he was at work answering telephones when he heard a loud "ruckus" at the front of the store with laughing and giggling. He asked what was going on. Garcia came back to where Monsivais was working and said Fuentes had herpes on her mouth. Then both Garcia and Carrillo joined in making fun of the herpes rumor and Carrillo repeated it. Some AutoZone drivers and other sales associates were present.

Carrillo testified that other employees repeated the rumor that Fuentes had herpes after Garcia started it. He identified Salas, Miles, Guadalupe Garcia, Monsivais, Jimenez, and one other whose name he could not recall, as employees who came to him to ask if he had heard that Garcia was saying that Fuentes had herpes. He said the employees as a group were laughing about the herpes rumor. Fuentes told Carrillo that she learned from Jimenez that Garcia was saying that she had contracted herpes from performing oral sex on Jimenez. Fuentes also told him that an employee at another store asked her if she had herpes.

Carrillo testified that Garcia treated the herpes rumor as a big joke until he found out that Fuentes had complained to Carrillo, who then forwarded her complaint to the district office. Garcia's demeanor changed at that point. Carrillo thought herpes was a sexually transmitted disease, like HIV. Carrillo said he had a serious conversation about the rumor with Guadalupe Garcia,

---

[3] While testimony established that AutoZone had a policy prohibiting dating between supervisors and subordinates, no evidence of a policy precluding coworkers from dating each other was introduced.

discussing the fact that this rumor was " 'messed up' " and whether something was going to be done about it.

Jennifer Arguelles also worked at the Normandie store during the relevant period. She overheard Garcia and Carrillo talking, giggling, and laughing together. She heard a mention of the word "lips." Arguelles testified that Garcia and Carrillo asked her if she had heard that "they" are saying the blisters on Fuentes's lips are herpes. She was helping customers at the time. Garcia was giggling, laughing and smiling. Garcia denied discussing the herpes rumor with Jennifer Arguelles.

## C. *Comments Involving Jimenez*

Jimenez testified that Carrillo would ask him if he had " 'hit Marcela' " which Jimenez understood to mean whether he had a sexual relationship with Fuentes. Carrillo asked Jimenez, " 'Hey, bro, have you fucked Marcela yet?' " He also asked if Jimenez had " 'beat them cheeks up.' " Jimenez said this was a query about Fuentes because Carrillo was " 'always talking about Marcela.' " Jimenez explained that he worked every other day and Carrillo always asked him about Fuentes. Jimenez said he told Fuentes about this because he did not think it was right. When he told her, she stayed quiet and said nothing.

Fuentes testified that Jimenez told her that Carrillo had asked him if he had " 'fucked' " Fuentes. This was after Vaca left, between May 17 and 24. Jimenez also told Fuentes that "they" were blaming him for the herpes because Fuentes had " 'sucked my dick.' " He also told her about the other comments by Carrillo about having sex with Fuentes. She was embarrassed and could not believe the managers were saying these things about her.

Garcia and Jimenez described an incident in which Garcia, Omar, Carrillo, Jimenez and a customer were talking. Carrillo told Jimenez: " 'Ricardo, you should be careful with Marcela [Fuentes].' " According to Garcia, when Jimenez asked what he was talking about, Carrillo said: " 'Be careful where you put your dick at with Marcela.' " Jimenez said Carrillo told him that he " 'should wash [his] dick because look what [he] had given Marcela on her lip.' " Garcia said he asked Carrillo what he was talking about. Carrillo mentioned that Fuentes had herpes blisters on her lip. During this incident Jimenez said Garcia and the customer were giggling and laughing. Jimenez got very upset and left. Carrillo was laughing. Garcia testified that he warned Carrillo he was not supposed to be talking about the herpes rumor. He also asked Carrillo if he was sure of what he was talking about, and Carrillo said, " 'No.' " Garcia denied thinking the blister on Fuentes's lip was herpes and said he did not know the word. This occurred while Vaca was on leave and

Fuentes was still working at the store. There were customers in the cashier's area, six or seven feet away, when Carrillo made this statement.

Jimenez told Fuentes that Carrillo had asked, " 'Why don't you wash your privates,' " referring to the herpes rumors. He testified that Fuentes looked mad and upset when he told her about this incident. Fuentes said she heard about this after May 26, within three to four days of May 27. Jimenez also told Fuentes that Carrillo said he had placed bets with some employees about Jimenez having sex with Fuentes.

Monsivais testified that Garcia asked him whether Fuentes and Jimenez were dating. He said he did not know. Garcia asked this question a few times. Monsivais talked with Jimenez about Garcia's comments.

D. *Other Sexual Comments*

After Vaca went on leave, Carrillo asked Fuentes to turn up the volume on the radio at work. He said: " 'Oh, Marcela, that's my jam, can you turn it up[?] I got a lap dance with this fine ass cougar at the strip joint.' " According to Fuentes, Carrillo talked about strippers about twice a week after Vaca left. She also said Carrillo invited her to a strip club a couple of times, but she did not go with him. Ulises Monsivais testified that when Vaca left, Garcia and Carrillo would refer to good-looking women customers as cougars and would announce that there was a cougar in a particular aisle. They also would alert other workers to watch when women were reaching for oil on a bottom shelf. They did not do this when Vaca was present.

One night when employees were cleaning the store in preparation for closing, Carrillo announced that he was getting ready to go to a strip club and invited all present to go with him. Fuentes did not accept the invitation. She told her coworker Guadalupe Garcia that she did not like Carrillo inviting her to a strip joint.

On another occasion, Fuentes was in the manager's office. Carrillo grabbed a magazine depicting women in bikinis from the top of the safe and asked her why she did not work at a strip club or pose for a magazine to make more money. In her answers to interrogatories, Fuentes said this happened on June 14, 2003, but at trial testified that it was early or mid-May. She then changed her testimony and said it was mid-June, before June 15.

The store carries magazines Jimenez described as "lowrider magazines" depicting women in bikinis. Garcia told Jimenez that Fuentes was in the wrong profession and should be working for strip joints or posing for a lowrider magazine.

### E. *Fuentes's Subjective Feelings*

When the herpes rumor started, Fuentes saw her coworkers look at her mouth, look at each other, and smile. They avoided eye contact with her. When she walked by, her coworkers would talk to each other, glance at each other, and look at her mouth. After the herpes rumor started she felt the customers disrespected her. They looked at her funny and one told her not to get mad. Nobody, including Garcia, made a comment about having herpes directly to her.

Fuentes shared her distress at this treatment with a number of coworkers. Monsivais testified that Fuentes approached him and asked if he had heard what had happened to her. He told her she should report it to Juan Vaca, the store manager, when he returned. Fuentes looked upset and her eyes were watery and sad. Fuentes also approached Jennifer Arguelles and asked if she had heard the herpes rumor.

Garcia's conduct in making Fuentes show her buttocks to the customers was especially disturbing to Fuentes because she had told him that she was having problems with certain male customers. She was concerned for her safety when she walked home from work at night. She wore a sweater tied around her waist to cover her backside because of Garcia's conduct and the flirtation of the customers. This led to her being written up for a dress code violation.

Fuentes was so upset by the incident in which Garcia forced her to show her buttocks to the customers that she reported it to Carrillo, the only other manager available. She also told Carrillo about Garcia spreading the herpes rumor. Carrillo corroborated that Fuentes had reported this conduct.

### F. *Analysis*

AutoZone argues that critical portions of Fuentes's testimony are "inherently improbable." It contends that the incidents we have summarized above all occurred on June 14 and June 15, 2003, rather than in the period between Memorial Day, May 26, and June 15, 2003, as Fuentes contends. We have reviewed the timeline of events as presented by the testimony and conclude that it does not support the construction given it by AutoZone. Fuentes heard about the herpes rumor and confronted Garcia about it in late May 2003, after the Memorial Day weekend. The incident during which Fuentes was directed to display her buttocks to the customers occurred after that. Other incidents, including the repetition of the herpes rumor and other sexualized comments, occurred at unspecified times during the May 27 to June 15, 2003 period. AutoZone dismisses the comments to Jimenez about whether his sexual

conduct with Fuentes had given her herpes because the statements were not made directly to Fuentes. It contends that Fuentes did not learn of these comments until June 15 at the earliest.

AutoZone also cites inconsistencies about when Fuentes first learned of the herpes comments. It contrasts Fuentes's testimony that Jennifer Arguelles came to her to ask if she had heard that Garcia was spreading a rumor that she had herpes, with Arguelles's testimony that she heard Garcia and Carrillo laughing and giggling and mentioning the word "lips." According to Arguelles, it was Fuentes who approached her about the rumor.

The different accounts of the turning incident presented at trial form the third basis for AutoZone's claim that Fuentes's testimony is inherently improbable. While Fuentes said that Garcia grabbed her hand to turn her around, Guadalupe Garcia said he did not touch Fuentes in the incident she observed. AutoZone argues that it is significant whether Garcia made his comments in Spanish during the display incident.

All of these issues are factual matters for resolution by the trier of fact. "[T]he credibility of witnesses is generally a matter for the trier of fact to resolve. Accordingly, the testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.] Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because -it contradicts the plaintiff's evidence, regardless how 'overwhelming' it is claimed to be. [Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].)

" 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' [Citation.] Such cases are rare indeed. [Citation.]" (*DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261 [104 Cal.Rptr.3d 93] (*DiQuisto*).) The *DiQuisto* court's reasoning in rejecting a claim similar to the claim made by AutoZone is instructive: "This case does not warrant the conclusion that [the defendant's] testimony was inherently improbable. The claimed falsity is not 'apparent without resorting to inferences or deductions.' [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] In short, plaintiffs' claim that [the defendant's] testimony is inherently unbelievable cannot be sustained. It thus provides no basis for reversal." (*Ibid.*)

■ Here, AutoZone attempts to avoid the deferential substantial evidence standard of review by labeling Fuentes's testimony inherently improbable. "However, as our Supreme Court has made clear on repeated occasions, ' "[g]enerally, 'doubts about the credibility of [an] in-court witness should be left for the jury's resolution.' " [Citation.] "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . ." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)' (*People v. Hovarter* (2008) 44 Cal.4th 983, 996 [81 Cal.Rptr.3d 299, 189 P.3d 300].)" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728 [118 Cal.Rptr.3d 270] (*Ennis*).) The *Ennis* court explained: "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying. Hence, the requirement that the improbability must be 'inherent,' and the falsity apparent 'without resorting to inferences or deductions.' [Citation.] In other words, the challenged evidence must be improbable ' "on its face" ' [citation], and thus we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts). The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*Id.* at p. 729.)

The evidence in this case is not "inherently improbable." It presents a common situation where there are inconsistencies and contradictions in trial testimony. As discussed, this is for resolution by the jury. We infer the jury credited Fuentes's testimony and the testimony corroborating it in light of the unanimous verdicts on liability.

The evidence at trial establishes that all the incidents and comments about Fuentes, including the directive that she display her buttocks to customers to increase sales, the herpes rumors, and the profane speculation about a sexual relationship between her and Jimenez, were focused on her gender. Fuentes was made the object of sexual humiliation and exploitation for the entertainment of managers, employees (including those at another store), and customers. (Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(B) [defining physical harassment as interference with normal work or movement on basis of sex].) When Garcia was confronted by Fuentes about the herpes rumor, he threatened to fire her if she raised the issue again. Significantly, he supported his threat by referring to a fictitious photograph of Fuentes kissing Jimenez, another sexual reference.

While these events occurred over a compressed period of time, the approximately three weeks between May 27, 2003, and June 19, 2003, we find substantial evidence that the harassment suffered by Fuentes was both pervasive and severe. During the time Vaca was absent on leave, placing

Garcia and Carrillo in charge, the harassment of Fuentes was ongoing. The incidents in which Garcia directed Fuentes to use her body to increase sales were physically humiliating. The herpes rumor and the demands that she display her body to customers unreasonably interfered with Fuentes's ability to perform her work. The customers cheered and laughed at her, and an employee from another store repeated the herpes rumor when she spoke with him on the telephone for a business purpose. Other groups of employees laughed about the herpes rumors.

■ The demands by Garcia that Fuentes display her body to customers as a means to increase sales, and the herpes rumors, distinguish this case from *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 282–283 [42 Cal.Rptr.3d 2, 132 P.3d 211] (*Lyle*) upon which AutoZone relies. In that case, a comedy writer's assistant, who worked on the production of the television show *Friends*, sued for sexual harassment based on exposure to sexually coarse and vulgar language and conduct in the writers' room. The court affirmed summary judgment for the defendants because most of the sexually coarse and vulgar language at issue did not involve and was not aimed at the plaintiff, or even other women in the workplace. (*Id.* at p. 271.) The Supreme Court reasoned: "[A] hostile work environment sexual harassment claim is not established where a supervisor or coworker simply uses crude or inappropriate language in front of employees or draws a vulgar picture, without directing sexual innuendos or gender-related language toward a plaintiff or toward women in general. [Citations.]" (*Id.* at p. 282.) Here, the conduct of Garcia and Carrillo was specifically aimed at Fuentes rather than toward women in general. Unlike the plaintiff in *Lyle*, Fuentes was subjected to verbal abuse and harassment. (*Id.* at p. 289.)

The work environment created by Garcia and Carrillo was objectively hostile and abusive, and thus unlawful. (*Lyle, supra*, 38 Cal.4th at p. 283.) This case can be distinguished from the three cases which AutoZone contends raised the threshold for a showing of sexual harassment. The first of these is *Hughes, supra*, 46 Cal.4th 1035.

*Hughes* involved a summary judgment motion based on sexual harassment under Civil Code section 51.9, which prohibits sexual harassment in certain business relationships outside the workplace. But it limits liability to harassing conduct that is " 'pervasive or severe,' " the language used to define liability for sexual harassment in the workplace under FEHA. (*Hughes, supra*, 46 Cal.4th at p. 1039.) The alleged sexual harassment was by a trustee of a trust in favor of a child and was directed at the child's mother. The charge was based on comments made by the defendant in a single telephone conversation and in a brief statement the defendant made to the plaintiff in person later that day during a social event. (*Id.* at p. 1048.) During the

telephone conversation, the defendant used terms of endearment and expressed his admiration and desire for the plaintiff. At the social event, he told her he would get her on her knees eventually and " 'I'm going to fuck you one way or another.' " (*Id.* at p. 1040.) The Supreme Court found this evidence insufficient to demonstrate either severe or pervasive harassment. It concluded that these isolated incidents in a single telephone call and one in-person encounter were not pervasive. (*Id.* at p. 1048.) It also found the evidence was not sufficiently severe to qualify as sexual harassment. (*Ibid.*)

AutoZone also relies on *Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365 [103 Cal.Rptr.3d 19] (*Haberman*), a summary judgment case. In that case, the plaintiff, who was a sales representative, relied on evidence of specific incidents with two individual defendants' which occurred over a period of several years. Defendant Bredenberg was the national sales manager who supervised the plaintiff's manager. He exchanged flirtatious e-mails with the plaintiff, asked her a number of times if she knew anyone interested in having sex without a relationship, and gave her compliments at various conferences both attended. While separately parking for a convention, Bredenberg called the plaintiff's cell phone and said something to the effect that "he was coming right up behind her and that it felt pretty good." (*Id.* at p. 371.) He also made general sexually tinged, but not profane, references about women. At some relevant times, the plaintiff reported directly to the other defendant, Reed. He told the plaintiff that if she brought a date to a company event, a few men in the company would be disappointed. (*Id.* at p. 373.)

The *Haberman* court held that the acts of the defendants fell "far short of 'establishing "a pattern of continuous, pervasive harassment" [citation], necessary to show a hostile working environment under FEHA.' [Citation.]" (*Haberman, supra*, 180 Cal.App.4th at p. 382.)

██ In the third case relied upon by AutoZone, *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121 [68 Cal.Rptr.3d 568], the alleged harassment involved three incidents occurring over a five-week period and included no physical threats. The defendant who was alleged to have committed the harassment was a member of the county board of supervisors, who did not directly supervise the plaintiff and did not work in the same building as she did. In the first incident, the defendant called the plaintiff an " 'aging nun' " when he learned she was not married. In the second, at a hotel celebration, the defendant took the plaintiff by the arm, pulled her to his body, and asked if she came to lobby him. When the plaintiff said she had not, he asked why

not and said that other women were there for that purpose. He told her she had a nice suit and nice legs and looked her up and down. The third incident, the most serious, occurred when the defendant put his arm around the plaintiff, asked for her home address, and as he put his arm around her, rubbed his arm against her breast. (*Id.* at p. 144.) The *Mokler* court held that these incidents fell short of establishing a pattern of continuous and pervasive harassment. It concluded: "Taken as a whole, the foregoing acts demonstrate rude, inappropriate, and offensive behavior. To be actionable, however, a workplace must be ' "permeated with 'discriminatory intimidation, ridicule and insult,' [citation] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.' " ' [Citation.]" (*Id.* at p. 145.)

The facts described in the cases cited by AutoZone are in sharp contrast to the evidence in this case. In *Hughes* and in *Mokler*, the harassers did not supervise the plaintiffs' work, and their conduct had no pervasive impact on the plaintiffs' work environments. In *Haberman*, while the defendants were managers superior to the plaintiff, their inappropriate comments were made sporadically over the period of several years and did not sink to the level of the vulgar comments made about Fuentes. In addition, the comments about Haberman were made through e-mail or in private conversation and the decision does not indicate that they were made in front of or to coworkers and customers. In none of the cases cited by AutoZone did a manager attempt to exploit a female employee's body in front of customers in order to increase sales as Garcia did with Fuentes.

■ The evidence presented by Fuentes established that her supervisors, Garcia and Carrillo, created a workplace " 'permeated with "discriminatory intimidation, ridicule and insult" ' " far more severe and pervasive than the circumstances presented in the cases cited by AutoZone. (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547], quoting *Harris v. Forklift Systems, Inc., supra*, 510 U.S. at p. 21.) The evidence established that Fuentes found the conduct of Garcia and Carrillo offensive. We conclude that a reasonable person would share that perception. (*Hughes, supra*, 46 Cal.4th at p. 1044.) We find substantial evidence to support the jury's verdict and affirm.

IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1221.

## DISPOSITION

The judgment is affirmed. Fuentes is to have her costs and fees on appeal.

Willhite, J., and Suzukawa, J., concurred.

A petition for a rehearing was denied December 6, 2011, and appellant's petition for review by the Supreme Court was denied February 1, 2012, S198930.