Filed 1/12/16  Teferi v. Ethiopian Sports Federation in North America CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ASFAW TEFERI, | B249880 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC361236) |
| v. | |
| ETHIOPIAN SPORTS FEDERATION IN NORTH AMERICA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph Kalin, Judge.  Affirmed.

Paul Kujawsky for Defendants and Appellants.

The Law Office of Herb Fox and Herb Fox for Plaintiff and Respondent.

_____

In this defamation action, defendants and appellants Ethiopian Sports Federation in North America (ESFNA) and its president Dawit Agonafer appeal from a judgment after jury trial in favor of plaintiff and respondent Asfaw Teferi.[1]  We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

ESFNA is an Ethiopian-American organization that sponsors soccer tournaments between member teams throughout the United States and Canada.  Each member team has two seats on ESFNA's board, one voting and one nonvoting.  Teferi began playing for the Ethio L.A. Stars (L.A. Stars), a Los Angeles based soccer team, in 1983.  The L.A. Stars joined ESFNA in 1985.  Teferi became president of the L.A. Stars in 1995 and soon thereafter the team elected him to the ESFNA board.  In 1998, Teferi began serving as auditor for the ESFNA executive committee, and in January 2002, ESFNA's secretary, Sileshi Mengiste, resigned and Teferi replaced him in that position.  Six months later, Teferi was asked to serve as both the auditor and secretary.

In early 2001, the board changed the location of its hotel headquarters for the ESFNA 2001 tournament.  ESFNA already had signed a contract with a Westin hotel in Santa Clara and a dispute arose over the cancellation penalty after the decision to change the location.  Initially, the dispute was handled by Mengiste, ESFNA's secretary at the time.  In October 2002, the ESFNA board held an emergency meeting to discuss problems at a tournament held in Washington earlier that summer.  At the end of the meeting, Mengiste asked to discuss the Westin issue and, for the first time, explained to the board what had happened and disclosed that Westin was bringing a legal claim over the cancellation penalty.[2]  Two of the 25 teams represented at the meeting questioned why the executive committee had not told them about the Westin dispute sooner and wanted to

[1] The notice of appeal states that appellants also appeal the order denying their motions for judgment notwithstanding the verdict and new trial.  Because the appellant's opening brief makes no separate argument as to that order, we do not address it.

[2] Westin originally sought a penalty of $83,000 from ESFNA.  The board authorized the executive committee to settle for $50,000.  After negotiations, ESFNA paid Westin approximately $20,000.

hold the executive committee responsible.

ESFNA's next general board meeting was held on January 18 and 19, 2003. January 18, the first item of business was the Westin issue and the following were discussed: which executive committee members knew about the dispute; those members first learned about it; whether the entire committee was whether the entire committee should take responsibility for not bringing the issue board members' attention at the previous meeting. On January 19, the board take a vote of confidence as to the executive committee. One board member testified at trial that the confidence vote was an action to remove the executive committee. Another testified that the vote was an expression of opinion. Three of the executive committee members resigned before the vote was taken: the officer working with the finance committee, the program coordinator, and the treasurer. The president's term had expired and, although he was re-nominated, he declined to run. The board elected Agonafer as president. Teferi was asked whether he would resign, he responded "[n]o. I haven't done anything wrong in this organization. I did everything to the best of my ability. So I want you to take a vote of confidence." Sixteen of the 25 teams represented voted "no confidence" with regard to Teferi. Teferi then resigned but offered to continue to serve as secretary for up to one year if the board was not ready to elect the next secretary.[3] The public relations officer and the business manager also were subject to a vote of confidence, but both received votes of confidence. The minutes of the January 2003 board meeting, prepared by Teferi as acting secretary, stated: "The vote of confidence was taken and the board clearly voiced their readiness to elect the next

---

[3] Teferi testified at trial that, according to Robert's Rules, he had three choices after the board voted it did not have confidence in him: (1) resign; (2) continue to work but acknowledge that the board wants him to "change [his] direction"; or (3) "be a dictator and say, 'I don't care what you say. I have a few supporters, and I'll just go on.'" Some witnesses testified that Teferi was warned at the meeting that if the board voted it did not have confidence in him, he would be banned from returning to ESFNA as a board member. Others testified that there was no suggestion Teferi had done anything wrong and no mention of his removal.

secretary at that meeting. The secretary resigned and the election process started." The minutes were approved at the board's next meeting.

Teferi served as secretary for six more months, while the board transitioned to to Redeat Bayleyegne, the new secretary. At the June 2003 general board meeting, meeting, ESFNA celebrated its 20th anniversary and the board presented Teferi with an with an award in "recognition and appreciation [for] the work [he] contributed all the the years."

Subsequently, the ESFNA board voted to fine and demote member team, the L.A. Dallol, to a lower division for fixing a game. In response to these penalties, the L.A. Dallol threatened a lawsuit against the federation. Abera Gebre, an officer of the L.A. Stars, wrote to the ESFNA executive committee and board on behalf of the L.A. Stars in February 2004, stating that, because Redeat was a representative of the L.A. Dallol team, there was a conflict of interest, and that Redeat should recuse himself from the controversy and take a leave of absence from the board. Agonafer, president of the board, responded that he disagreed with the L.A. Stars' position that there was a conflict of interest. At trial, Teferi testified that Redeat and Agonafer "really took that [letter] personal" against him.

In October 2004, the ESFNA board adopted the executive committee's recommendation for guidelines on team rights and responsibilities, which addressed election of board representatives. The recommendations provided in part that "[t]eam representatives shall not be individuals that were disciplined for highly offensive conduct, removed, impeached and/or forced out of the Federation by the Board or other disciplinary body due to gross misconduct and other offenses while as elected officials and/or players in ESFNA." According to the minutes of the board meeting, the recommended guideline was adopted in response to an issue involving a representative from the Washington D.C. Stars. The minutes for that meeting stated that "[i]n addition, the Board decided that any individual forced out of the Federation via impeachment and/or vote-of-confidence shall not come [*sic*] back to the Federation [in] any capacity." At the meeting, the board's attorney advised that ESFNA could call "the 'forcing of

4

someone' out of . . . office 'impeachment,' 'vote of confidence' or any other term as long as the intention is clearly understood and stated by the Board of Directors."

Teferi rejoined the leadership of the L.A. Stars in 2004. In early 2005, he was elected president of that club. The former president of the club notified ESFNA that Teferi was its new president and that all further communication should go through him. Agonafer, ESFNA's president at the time, called Gebre and told him that because Teferi had been "impeached" he was banned from coming back to the ESFNA board.[4] On April 25, 2005, Agonafer sent an email on behalf of ESFNA to members of the L.A. Stars' leadership, including Teferi, stating "The ESFNA Board's decision for board member selection [is] criteria for all [its] member clubs. As it relates to your club, ESFNA Board overwhelmingly voted to impeach . . . Asfaw Teferi via a vote of no confidence procedure. Please read . . . the criteria the Board unanimously adopted during [its] October general assembly. Please note that this email is to reflect the fact that Asfaw Teferi did not survive a no confidence procedure. This is not to get into what Asfaw may or may not have done during his service to ESFNA. We are simply enforcing a unanimous decision by the Board to [impeach] the individual not to come back to the Federation in any capacity." In response to this email, Teferi wrote to Agonafer, asking "[w]hen did this happen, and what did I do wrong?" The L.A. Stars' secretary also asked Agonafer for further information about the allegation that Teferi had been impeached and for documents that would support the claim. Agonafer responded on May 2, 2005, "I would like to inform you again that the fact remains that Asfaw Teferi was removed by a vote of no confidence procedure. As you mistakenly put it, this is not an allegation. It is a fact that he was impeached." At no point did Agonafer clarify that Teferi had asked for the vote of

_____

[4] ESFNA meetings are conducted in a combination of English and Amharic, the native language of the majority of members. There is no direct translation of the word "impeach" in Amharic.

5

confidence and resigned after the vote was taken.

On May 22, 2005, ESFNA's executive committee held a teleconference with the board. One of the items discussed was the January 2003 board meeting minutes prepared by Teferi. After noting that the minutes did not reflect the outcome of Teferi's vote of confidence, the board of directors voted 16-1 with four abstentions, to give the executive committee "the authority to amend the January 2003 [minutes] in accordance with what transpired at the time." Before adjourning the teleconference, the board voted to include the following statement in the minutes: "according to the October 2004 General Board meeting decision, Mr. Asfaw Teferi shall not come back to the Federation at any capacity."

Subsequently, Teferi called a general meeting of the L.A. Stars' board members and told them "it would not be in the best interest of the team for [him] to continue as the president because [he did not] want backlash to come from the Federation."[5] Teferi then resigned from his position as president of the L.A. Stars.

On November 1, 2006, Teferi filed a complaint against ESFNA and Agonafer. The second amended complaint, the charging pleading, alleged a single cause of action for defamation based on the statements made by Agonafer and the ESFNA board that Teferi had been impeached. At trial, the court granted defendants' request that the jury be instructed pursuant to CACI No. 1700 and rejected plaintiff's request for instruction pursuant to CACI No. 1704. CACI No. 1700 provides the essential factual elements a public figure plaintiff must prove on a defamation claim. CACI No. 1704 provides the essential factual elements required for defamation when the plaintiff is a private figure and the matter is of private concern. The trial court also denied defendants' request for the common interest privilege instruction under CAC1 No. 1723. The jury found in favor of Teferi and awarded him $100,000 in damages ($30,000 against Agonafer and $70,000 against ESFNA). The trial court denied defendants' motions for judgment notwithstanding the verdict and for a new trial.

---

[5] Agonafer testified at trial that Teferi could have continued to serve as his team's president, but could not serve as the team's representative to ESFNA's board.

6

## DISCUSSION

### I

We begin by determining whether the trial court erred in instructing the jury pursuant to CACI No. 1700 (elements a public figure must prove to establish defamation).[6] Teferi argues that he is a private figure and hence that the jury should have been instructed pursuant to CACI No. 1704 (elements a private figure must prove to establish defamation). We agree.

The Supreme Court has imposed a higher standard applicable to defamation suits by public officials and public figures, requiring that where the plaintiff is a public figure, he or she must prove the defamatory statements were made with malice in order to recover for defamation. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280; *Curtis Pub. Co. v. Butts* (1967) 388 U.S. 130, 134.) Accordingly, CACI No. 1700 requires a plaintiff to prove "by clear and convincing evidence that [the defendants] knew the statement(s) [were] false or had serious doubts about the truth of the statement(s)," while the instruction for a private figure, CACI No. 1704, requires only a finding that the defendants "failed to use reasonable care to determine the truth or falsity of the statement(s)."

Whether a plaintiff in a defamation action is a public figure is a question of law. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252 (*Reader's Digest*).)

---

[6] Under the public figure instruction given at trial, Teferi had to prove that the defamatory statement "Teferi was impeached from his position as Secretary" (1) was made by defendants to other people; (2) that those to whom the statement was made reasonably understood that the statement was made about Teferi; (3) that the persons to whom the statement was made reasonably believed it to mean that Teferi was incompetent to perform his job as secretary; and (4) that the statement was false. Additionally, Teferi had to prove by clear and convincing evidence that "one or both Defendants knew the statements were false or had serious doubts about the truth of the statements." The public and private figure instructions share the first three elements but under the fourth element a private figure has to prove only that defendants "failed to use reasonable care to determine the truth or falsity" of the statement. Additionally, a private figure does not have to prove that the defendants knew the statements were false or had serious doubts about the truth of the statements. (CACI No. 1704.)

7

"On appeal, the trial court's resolution of disputed factual questions bearing on the public figure determination is reviewed for substantial evidence, while the trial court's resolution of the ultimate question of public figure status is subject to independent review for legal error. [Citations.]" (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 264; see also *Weingarten v. Block* (1980) 102 Cal.App.3d 129, 134-135 [question of whether evidence supports finding plaintiff is public figure is mixed question of law and fact to be preliminary determined by trail court].)

For a plaintiff to qualify as a "public figure" there must first be a public controversy, the plaintiff must have voluntarily inserted himself or herself into that controversy in order to influence the resolution of the public issue, and the alleged defamation must be germane to the plaintiff's participation in the controversy. (*Copp v.* (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846; see also *Reader's Digest*, *supra,* 37 Cal.3d at p. 254 [for a plaintiff to be deemed a "public figure" the "plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved"].)

We conclude as a matter of law that Teferi was not a public figure. First, it is not clear that there was a public controversy—one in which the issues are "'being debated publicly'" and there are "'foreseeable and substantial ramifications for nonparticipants.'" (*Copp v. Paxton, supra*, 45 Cal.App.4th at p. 845.) The issue of Teferi's vote of no confidence and subsequent resignation arose during a board meeting of a national organization but the facts do not indicate that the issue was debated publicly or that the vote and subsequent resignation had substantial ramifications for nonparticipants.

Nor does the record support a finding that Teferi undertook a "voluntary act" through which he sought to influence the resolution of a public controversy. In *Reader's Digest*, *supra*, 37 Cal.3d at pages 254-255, the California Supreme Court explained that "courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies." (See also *Khawar v. Globe Internat., Inc.*, *supra,* 19 Cal.4th at p. 265 ["[T]he high court has never stated or implied that it would be proper for a court to characterize an

8

individual as a public figure in the face of proof that the individual had neither engaged in purposeful activity inviting criticism nor acquired substantial media access in relation to the controversy at issue."].)

Teferi asked for a vote of confidence at the January 2003 ESFNA board meeting, and after the board voted he resigned. Teferi did not publicize the vote or his resignation. The only action Teferi took in connection with the vote and resignation was to write the minutes of the board meeting, which included a discussion of the vote and his resignation, but this action was taken pursuant to his duties as secretary. As we have stated, the minutes were approved at the next board meeting, which took place in June 2003. The issue of Teferi's vote of confidence and resignation did not resurface until 2005, when Agonafer communicated to the L.A. Stars that Teferi had been "impeached" by a vote of no confidence and therefore was banned from coming back to the ESFNA board as the L.A. Stars' representative. Teferi did not voluntarily raise this issue; his only actions were to respond to Agonafer's communications with the L.A. Stars, by asking for information about what he had done wrong. Finally, the only media coverage that arose out of the controversy was an article written in an Ethiopian newspaper *after* Teferi filed this lawsuit, and Teferi neither contributed to the article nor had an opportunity to respond to it. These facts clearly illustrate that no affirmative action was taken by Teferi to "thrust himself" into a public controversy, nor was there sufficient media attention regarding the controversy, to find Teferi was a public figure.

## II

Teferi, as a private figure plaintiff, should have had to prove that (1) the defamatory statement "Teferi was impeached from his position as Secretary" was made by defendants to other people; (2) that those to whom the statement was made reasonably understood that the statement was made about Teferi; (3) that the persons to whom the statement was made reasonably believed it to mean that

9

Teferi was incompetent to perform his job as secretary; and (4) that defendants "failed to use reasonable care to determine the truth or falsity" of the statement.

Defendants argue there is a lack of substantial evidence to support a finding that those hearing the statement reasonably believed it to mean that Teferi was incompetent to perform his job as secretary.

When reviewing a verdict for substantial evidence, we must determine whether the evidence is "reasonable in nature, credible, and of solid value." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644.) "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

Neither the jury instructions nor the verdict form defined the term "competence" or "incompetence" and neither party discussed its meaning in closing arguments. The term "incompetent" is commonly understood to mean "inadequate to or unsuitable for a particular purpose," "lacking the qualities needed for effective action," or "unable to function properly." (Webster's Collegiate Dict. (10th ed. 1995) p. 588; see also Black's Law Dict. (9th ed. 2009) p. 833, col. 2 [defining "incompetence" as "[t]he state or fact of being unable or unqualified to do something"].)

Teferi was a member of the executive committee, ex officio to serving as its secretary. When Agonafer told the L.A. Stars that the ESFNA board overwhelmingly voted to impeach Teferi via a vote of no confidence, he referred them to the criteria the board unanimously adopted at its October 2004 meeting, prohibiting individuals from serving as team representatives if they had been "disciplined for highly offensive conduct, removed, impeached and/or forced out of the Federation by the Board or other disciplinary body due to gross misconduct." The clear implication was that Teferi was not suitable to serve on the executive committee because he had engaged in egregious conduct. Accordingly, the jury reasonably could have inferred that the statement that Teferi had been impeached meant that he had been forced off the executive committee because he was incompetent.

10

As to the fourth element, at trial under the public figure instruction, plaintiff had to prove by clear and convincing evidence that defendants knew the statements were false or had serious doubts as to their truth. Under the lower negligence standard required of a private figure plaintiff, Teferi needed to prove only that defendants "failed to use reasonable care to determine the truth or falsity of the statement(s)." (CACI No. 1704.) We find substantial evidence to support the negligence standard. At ESFNA's January 2003 board meeting, there was a motion for a vote of no confidence as to the entire executive committee. Before the vote was taken, several members of the executive committee resigned, but Teferi did not. Instead, he asked for a vote of confidence. The majority of board members voted that they did not have confidence in Teferi, upon which he resigned. At the time of the vote, "impeachment" was not a procedure used by the board. The board had a procedure in its bylaws for removing members but did not employ it with regard to Teferi.[7] As we have discussed, in October 2004, long after Teferi's resignation, the board's attorney advised the board members that ESFNA could call "the 'forcing of someone' out of . . . office 'impeachment' 'vote of confidence' or any other term as long as the intention is clearly understood and stated by the Board of Directors."

Teferi and others testified that there was no discussion of removal at the January 2003 meeting. Other witnesses testified that the vote of confidence was a removal procedure. "'[T]he credibility of witnesses is generally a matter for the trier of fact to resolve. Accordingly, the testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.]

---

[7] The bylaws provide that "[a]ny officer or agent or member of the Executive Committee elected or appointed by the Board of Directors may be removed by the Board of Directors whenever in its judgment the best interests of the Federation will be served thereby, but such removal shall be without prejudice to the contract rights of any of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights."

Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because it contradicts the . . . evidence [supporting the judgment], regardless how "overwhelming" it is claimed to be. [Citation.]' [Citation.]" (*Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221,1233.) The jury found that defendants either knew the statement that Teferi had been "impeached" was false or had serious doubts as to its truth. This supports a reasonable inference that the jury found that at the time of Teferi's vote of confidence, the board did not *clearly* understand that such a vote constituted a forcing out or removal procedure. Based on these facts, we conclude that there is substantial evidence to support a finding that defendants were at least negligent as to the truth or falsity of the statement.

III

We next address whether the trial court erred in denying defendants' request to instruct the jury pursuant to CACI No. 1723, the common interest privilege. A party is entitled to request that the jury be correctly instructed on any of the party's theories of the case that is supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) An erroneous refusal to instruct the jury is reversible if it is probable that the error prejudicially affected the verdict. (*Id*. at p. 580.)

CACI No. 1723 is premised on Civil Code section 47, subdivision (c), which provides that a privileged publication is one made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."[8] "Section 47(c) establishes that certain communications made between persons on a matter of common interest are privileged if the statements are made 'without malice.'" (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1203-1204, fn. omitted (*Lundquist*).) If the communication was "made without malice, it

_____

[8] All further statutory references are to the Civil Code unless otherwise indicated.

is privileged and cannot constitute a defamation under California law." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 723, fn. omitted (*Brown*).)

A. *Forfeiture*

The claim of privilege in a defamation action is an affirmative defense which must be specifically pleaded in the answer, unless the privilege appears on the face of the complaint. (*Everett v. California Teachers Assn.* (1962) 208 Cal.App.2d 291, 293 (*Everett*).) On appeal, Teferi argues that defendants have forfeited their common interest privilege claim because they failed to raise it as an affirmative defense in their answer and it does not appear on the face of the operative second amended complaint.

In *Everett*, *supra*, 208 Cal.App.2d at page 293, the court found that allegations in the complaint asserted facts sufficient to show a qualified privilege under section 47, subdivision (c). The complaint named a California teachers association as one of the defendants; other defendants were members of the association. The complaint alleged the members were appointed by the association and were acting on behalf of the association and on behalf of themselves when the defamatory statements were made in a report about certain elementary schools. It also alleged the plaintiff was an employee and administrator of the school district. (*Everett*, at pp. 293-294.) The court explained that the qualified privilege appeared on the face of the complaint because "certificated public school employees and their associations have a legitimate interest in investigating and reporting on the conduct of an individual certificated employee." (*Id*. at p. 294.)

As in *Everett*, the allegations in Teferi's second amended complaint are sufficient to support a showing of a qualified privilege under section 47, subdivision (c). The complaint names ESFNA and Agonafer as defendants and alleges that Agonafer was an officer and/or board member of ESFNA and that each defendant was the "principal, agent, servant, representative or employee of each of the remaining [d]efendants" and was "acting within the course and scope

13

of such employment, agency, or relationship." The complaint also alleges that Teferi is a "member of a Team which directly or indirectly is a member of Defendant ESFNA"; Teferi served as a member of ESFNA's executive committee from 1997-2003; and he resigned in January 2003 after the board of directors conducted a "no confidence" vote as to him. Teferi also alleged that defendants sought to undermine his election as president of the L.A. Stars in 2005 by communicating to that club that he was not qualified to be their president because he had been impeached by ESFNA at the January 2003 board meeting. Teferi's allegation that defendants communicated the alleged defamatory statements to the L.A. Stars, one of ESFNA's member teams, supports a finding that the communication was made to an interested party because the issue of Teferi's alleged impeachment was relevant to whether he was eligible to serve as a representative of the L.A. Stars to the ESFNA board. Because the basis for the privilege appears on the face of the second amended complaint, it has not been forfeited. (See *Everett, supra,* 208 Cal.App.2d at p. 293.)

        B.    *Existence of Privilege*

        "Ordinarily, the existence of . . . privilege is a legal question for the court. [Citations.] While the jury may be required to determine disputed facts relating to the existence of the privilege, it is for the court to decide whether the facts found by the jury made the publication privileged or to instruct the jury as to what facts they must find in order to hold the publication privileged. (Rest.2d Torts, § 619, com. a; see also *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913 ["Any doubt about whether the privilege applies is resolved in favor of applying it"].) Here, since the court did not do that, we regard the issue on appeal as whether there existed a privilege as a matter of law." (*Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 13-14, fn. 5; see also *Gantry Constr. Co. v. American Pipe & Constr. Co.* (1975) 49 Cal.App.3d 186, 197 [the trial court erred in leaving the determination of whether the qualified privilege existed to the jury because the determination should have been made by the trial court and the only issue the trial court should have instructed the jury to determine was

14

whether the communication was made with malice, in which event the privilege never arose].)

The statements made by defendants that Teferi had been impeached and forced out of the ESFNA board were made in the context of whether Teferi was qualified to serve as the L.A. Stars' representative to the ESFNA board. The L.A. Stars is a member team of ESFNA and each member team can elect a representative to the ESFNA board. The L.A. Stars' outgoing president informed ESFNA that Teferi was their new president and that all future communications should go through him. At the time the L.A. Stars elected Teferi as its president, ESFNA had a rule, adopted by the board in October 2004, that individuals who had been forced out of ESFNA via "impeachment and/or [a] vote of [no] confidence" could not come back to the federation in any capacity. Agonafer contacted the L.A. Stars to say that Teferi could not serve as their representative to the ESFNA board because he had been "impeached via a vote of no confidence." Because this communication was made to an interested party in the context of ESFNA's organizational policies and procedures, the jury should have been instructed on the qualified privilege.

IV

A jury verdict will be set aside because of instructional error only if the appellant can demonstrate that "'the error was prejudicial (Code Civ. Proc., § 475) and resulted in a "'miscarriage of justice.'"' [Citations.]" (*Lundquist, supra,* 7 Cal.4th at p. 1213.) A miscarriage of justice occurs if, based on the entire record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to appellants absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Defendants argue that the court's refusal to instruct the jury pursuant to CACI No. 1723 was prejudicial error. Under the public figure instruction that was given, the jury was instructed that defendants were liable if "Teferi . . . prove[d] by clear and convincing evidence that [Agonafer] knew the statements were false

15

*or* had serious doubts about the truth of the statements." Under the common interest privilege, "[t]he defendant has the initial burden of showing the allegedly defamatory statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice. [Citation.]" (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 915; see also *Lundquist, supra*, 7 Cal.4th at p. 1203.) The privilege does not apply if the plaintiff proves "actual malice," i.e., that defendants, in making the statement(s), "acted with hatred or ill will toward [the plaintiff,] showing [defendants'] willingness to vex, annoy, or injure [him]; or [¶] . . . that defendants had no reasonable grounds for believing the truth of the statement(s)." (CACI No. 1723; *Lundquist*, at p. 1204; see also *Brown, supra*, 48 Cal.3d at p. 723, fn. 7 ["if malice is shown, the privilege is not merely overcome; it never arises in the first instance"].) Because the jury was not instructed that the defendant had asserted as a defense that the communication was privileged, it was not given the "actual malice" instruction under CACI No. 1723.

Teferi argues that even if the court erred in failing to instruct the jury pursuant to CACI No. 1723, the common interest privilege, the instruction "could not possibly have resulted in a different verdict, [thus] the error, if any, was harmless." The thrust of Teferi's argument is that the jury's finding that defendants knew the statements were false or had serious doubts about the truth of the statements, constituted a finding of "actual malice" under the public figure analysis (CACI No. 1700), which also satisfies a finding of "actual malice" under the common interest privilege instruction (CACI No. 1723).[9]

---

[9] In *McGrory v. Applied Signal Technology, Inc*. (2013) 212 Cal.App.4th 1510, 1539, footnote 18, the court addressed the evolution of the malice standard under the common interest privilege and under a public figure defamation cause of action but did not resolve the question whether there is a difference between the two since that question was not before the court. In *Brown, supra*, 48 Cal.3d 711, the California Supreme Court differentiated the *New York Times* "actual malice" standard from the common interest privilege standard, explaining that "'[t]he malice referred to by the statute [section 47, subdivision (c)] is actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.'

The common interest privilege would have instructed the jury that, in order to prevail, Teferi had to prove that in making the statement defendants either "acted with hatred or ill will" toward him, or that defendants "had no reasonable grounds for believing the truth" of the statement. (CACI No. 1723.) Because the jury found that defendants knew the statement was false or subjectively had serious doubts as to its truth, it is at least reasonably probable the jury would also have found under an objective standard that defendants had no reasonable grounds for believing the truth of the statement. Teferi asked for a vote of confidence and after the board voted that it did not have confidence in him, he resigned. At the time, "impeachment" was not a procedure used by the board. The board had a specific procedure for removing members, but did not employ it to remove Teferi. Counsel advised that ESFNA could call "the 'forcing of someone' out of . . . office 'impeachment' 'vote of confidence' or any other term as long as the intention is clearly understood and stated by the Board of Directors." But the jury found the evidence did not support the claim that Teferi had been *forced out,* as evidenced by its finding that the statement was false. Because the jury found that the defendants either knew the statement was false or had serious doubts as to its

---

[Citation.] Constitutional malice [required under the public figure jury instruction], although also often called actual malice, means only that, '[t]he defendant in fact entertained serious doubts as to the truth of his publication.' [Citation.] The high court has distinguished traditional malice (ill will) from constitutional malice. [Citation.] Actual hatred or ill will is arguably a much greater degree of fault than mere doubt as to accuracy." (*Brown*, *supra*, at p. 745.) More recently, in *Taus v. Loftus* (2007) 40 Cal.4th 683, 721, the California Supreme Court explained that the malice standard necessary to defeat a common interest privilege required a "showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." In determining whether there is prejudice, we apply the more recent *Taus* standard as cited in CACI No. 1723 (although CACI No. 1723 cites the *Taus* standard under the Sources and Authority, the instruction omits the "and therefore acted in reckless disregard of the plaintiff's rights" language from the second half of the disjunctive cited in *Taus*).

truth, it is clear that it would have found no reasonable ground for the defendants to believe the statement was true.

Accordingly, it is not reasonably probable that the jury would have reached a result more favorable to appellants if the common interest privilege instruction had been given.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

EPSTEIN, P. J.

We concur:

MANELLA, J.                                         COLLINS, J.

18