Filed 11/9/15 Geoghegan v. City of Los Angeles CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MAURA GEOGHEGAN et al., | B255496 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BS137316 & BS137317) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Silver, Hadden, Silver & Levine, Richard A. Levine and Jacob A. Kalinski, for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

_____

Maura Geoghegan and Clifford Byerly were dismissed from the Los Angeles Police Department (LAPD)[1] for filing false police reports and probable cause declarations about two drug-related arrests and for failing to notify their supervisor of their contact with an informant during the first arrest. The trial court denied their petitions for writ of mandate, finding that appellants falsely represented they had personally observed the events that led to the arrests when in fact they had relied solely on information received from a confidential reliable informant, and that they had not notified their supervisor before they contacted the informant on the day of the first arrest.

Appellants argue they were denied a fair hearing because the Board of Rights (BOR) accepted the LAPD expert's unreliable testimony about appellants' location at various times on the day of the first arrest, based on Geoghegan's cell phone records, but did not allow appellants' cell phone expert to testify. The BOR's rulings were justified, and because the cell phone experts' testimony is not dispositive of the issue of appellants' misconduct, they did not prejudice appellants. Appellants also argue the trial court's findings of misconduct are not supported by substantial evidence. The case against appellants turned on weighing witness credibility, which we cannot reweigh on appeal. We affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

In 2008, Geoghegan held the rank of Police Officer II, and Byerly the rank of Police Officer III. They had been LAPD officers for over 10 years, and had been assigned to the Southeast Narcotics Enforcement Detail (narcotics unit), working as partners for two years. Robert Lance Riske held the rank of Detective I and had worked narcotics since 2003. He transferred to the narcotics unit in July 2008 and was assigned to work with Police Officer II Pierre Vieillemaringe. The four officers' names were included in police reports Byerly and Geoghegan wrote for arrests that took place on August 21, 2008 and September 25, 2008 in Southeast Los Angeles.

---

[1] Respondents are the City of Los Angeles and the LAPD's chief, Charles Beck.

2

## A. The Police Reports

Byerly wrote the police report and prepared the probable cause declaration for the August 21, 2008 arrest of Nakia Golden. Geoghegan reviewed the report and made no corrections. The report states that "at approximately 1845 hours," appellants conducted surveillance of the parking lot at Croesus Avenue and 114th Street. From their observation post, they saw Golden sell drugs he obtained from a brown paper bag located in the dryer vent of "11430 S Croesus Avenue unit 481," which was about 50 feet from the parking lot. "At approximately 1900 hours," after seeing Golden sell drugs to a man on a bicycle, Geoghegan requested that Riske and Vieillemaringe stop the bicyclist, but they were unsuccessful. Instead, Riske and Vieillemaringe detained Golden, and appellants recovered a brown paper bag containing baggies with what appeared to be rock cocaine from the dryer vent of unit 481. Additional drugs and a large amount of cash were recovered after Golden was searched. The time of arrest listed on the report is "1910." The probable cause declaration states that "officers observed Golden engage in hand to hand narcotics transactions," and saw him remove rock cocaine from a brown bag stashed in the dryer vent of unit 481.

Geoghegan wrote the police report and prepared the probable cause declaration for the September 25, 2008 arrest of Byron Campbell. Byerly reviewed the report and made no corrections. The "source of activity" section of the report states that at "approximately 1615 hours," Geoghegan and her partners Byerly, Riske and Vieillemaringe were working in plain clothes and driving unmarked vehicles. They had received information from another officer that drugs were being sold in the area of 1500 East 105th Street. The "investigation" section of the report states that appellants observed approximately five transactions during which an individual handed what appeared to be money to Campbell, who was sitting on a crate on the sidewalk. Campbell would then walk across the street to a brown Buick, reach into the rear wheel well on the driver's side and remove a black box, from which he would take out a small white object. He then would place the box back in the wheel well, walk back, and hand over the white object to the individual who had given him money. Appellants "relayed

3

[their] observations to [their] partner officers at the location" and "advised them to assist" in detaining Campbell. Geoghegan and Vieillemaringe "contacted Campbell," while Byerly and Riske searched the Buick. After Riske removed a box with what appeared to be cocaine from the rear driver's side wheel well area, Campbell was placed under arrest. Byerly then recovered two additional boxes from the front driver's side wheel well and from inside the trunk. Campbell's mail was found in the car, and cash was found in the car and on his person. The arrest time listed on the report is "1645." The probable cause declaration states that "while monitoring 1500 block E. 105th St. [appellants] observed Campbell engaged in hand to hand narcotic transactions. He would remove a black box from his vehicle containing off white solids resembling rock cocaine."

B. *The Charges against Appellants*

Riske did not immediately read the August 21 report, but a week or two after Golden's arrest, he overheard appellants talking about having conducted surveillance on Golden. Riske was surprised because he was under the impression that appellants had relied on an informant. Riske read both reports after the September 25 arrest of Campbell, concluded that they were intentionally false because they contradicted his recollection of events on both days, and reported appellants to the narcotics unit supervisor, Detective III John Zambri, and the unit's lieutenant, Peter Zarcone.[2]

As to the August 21 report, Riske disputed that appellants had called him and Vieillemaringe from an established observation post. He also disputed seeing Golden sell drugs to a man on a bicycle. Riske was concerned that the report did not mention the presence of an informant at the scene. As to the September 25 report, Riske disputed that

---

[2] Shortly after his transfer into the narcotics unit and before he reported appellants, Riske learned from Zambri that the latter had talked to Zarcone about removing appellants from the unit due to a recent complaint against them. Riske believed Zambri discussed appellants with him because Riske was being groomed for an open Detective II position. Zambri confirmed he had shared his concerns about appellants with Zarcone and he had advised Riske of a Detective II opening in the unit. Zambri did not recall discussing his concerns about appellants with Riske individually, and he denied having promised Riske a promotion. After he reported appellants, Riske was considered a "snitch" and had to transfer out of the unit.

4

all four officers conducted surveillance on Campbell or that appellants relayed any observations they had personally made. According to Riske, Campbell had been placed under arrest before Riske and Vieillemaringe arrived at the scene. Once again, Riske was under the impression that appellants acted on an unverified tip from an informant. The use of an informant must be disclosed in the police report if the officers rely on an informant's tip without corroborating it through personal observation; the informant in such cases is treated as a percipient witness.

As a result of the ensuing investigation, each appellant was directed to a BOR hearing on six counts of misconduct related to the two arrests. Two of the counts for each appellant pertained to submitting false police reports on August 21 and September 25 (counts 1 and 2 as to Geoghegan, counts 1 and 3 as to Byerly). One count pertained to committing perjury on a probable cause declaration (count 2 as to Byerly, based on the August 21 arrest, and count 3 as to Geoghegan, based on the September 25 arrest). Additionally, both appellants were charged with failing to notify a supervisor of telephonic contact with an informant on August 21 (count 4) and September 25 (count 6), and failing to notify the communications division that they were conducting an investigation in the area of 105th Street on September 25 (count 5).[3]

C. *Evidence Related to Golden's Arrest*

Geoghegan's cell phone records show that her informant called her before noon on August 21, and she recalled he told her a drug dealer known as Big Marv was selling drugs in the parking lot at 114th Street and Croesus Avenue (Croesus location), located within the Imperial Courts housing project. Appellants' identical logs for the day list a contact with the informant at 12:30, and appellants testified they notified Zambri of the informant's call during the noon roll call. On September 11, Zambri approved payment

---

[3] The results of the internal investigation were reviewed by the Justice System Integrity Division of the Los Angeles County District Attorney's Office, which declined to initiate criminal proceedings against appellants.

to the informant for Golden's arrest, and on September 26, he initialed the entry in appellants' logs, without checking whether he had been notified.

Zambri had no independent recollection of having been notified about appellant's planned use of an informant on August 21, and no record of a notification appeared in his daily report for that day, despite his usual practice to record all notifications. Based on the absence of a record of notification in his daily report, Zambri testified he was not notified of appellants' planned contact with the informant. While acknowledging he made mistakes, Zambri stated that failing to record a notification "would be a heck of an oversight" for him.

Geoghegan was in contact with the informant throughout the afternoon and evening of August 21. She did not recall what the two talked about, but believed the informant was "either trying to get down to the area" or giving her follow-ups about Big Marv. Appellants' logs show they conducted surveillance at other locations during the afternoon, the last being at "117th/Mona" at 18:00, followed by Golden's arrest at "11430 Croesus #481" at 18:45.

Geoghegan's cell phone records show a call from the informant at 18:05 and calls to the informant at 18:06 and 18:07, followed by calls to Vieillemaringe at 18:09 and 18:12, calls from Vieillemaringe at 18:14 and 18:25, and eight calls to the informant between 18:31and 19:09. Based on these phone records, appellants testified that they conducted surveillance at the Croesus location between 18:15 and 18:25, rather than at 18:45.[4] Geoghegan did not remember the specifics of those conversations, but she believed her calls to the informant immediately before the surveillance were to tell him she would be unavailable, and her calls to Vieillemaringe were to tell him appellants would be setting up an observation post in Imperial Courts.

---

[4] During the internal investigation, appellants took the position that the surveillance at the Croesus location had begun about 18:05. They changed their testimony at the BOR hearing because they remembered Geoghegan had not been on the phone during the surveillance, and her phone records showed no calls between 18:15 and 18:25. Appellants explained the times listed in the arrest report and their logs were estimated and often inaccurate because appellants did not take notes during the day.

As to the actual surveillance, appellants testified they parked their unmarked car in a lot across from the Croesus location, used a military veil to conceal their presence, and observed through binoculars. They saw Golden, a known gang member and drug dealer, make two to three hand-to-hand transactions, during which he received money and disappeared from view between the buildings, then returned with a small object, which he handed to the buyer. After observing for five to 10 minutes from the car, Geoghegan put on a disguise and went out to surveil on foot. Within five minutes, she saw Golden go to the dryer vent of unit 481 three times. Each time he retrieved a brown bag, removed a baggie, and placed the bag back in the vent.

When Geoghegan returned to the car, appellants decided to meet the backup officers, Riske and Vieillemaringe, at the parking lot of a nearby sheriff's substation,[5] and Geoghegan told this to Vieillemaringe in the 18:25 call. Appellants arrived at the meeting place around 18:30 to 18:35 and waited 15 to 20 minutes for the backup officers. The meeting lasted about 10 minutes and the four officers returned to the Croesus location together. Geoghegan did not recall specifically what was said during the meeting, but claimed it was appellants' practice to relay their observations to the backup officers.

Riske and Vieillemaringe did not corroborate having been briefed about appellants' observations during the meeting. According to Riske, Geoghegan phoned Vieillemaringe around 18:15 and told him appellants' informant was out at Imperial

---

[5] At the BOR hearing, the location of the substation was variously identified as "Imperial Highway and Wilmington," "Imperial . . . near Wilmington," or "Imperial Highway and Grape Street." The meeting place appears to have been about two blocks southwest of the Croesus location. Appellants' justification for leaving the Croesus location was their concern that Riske would get lost in the projects. Detective Patrick Foreman, who was in charge of the narcotics unit at the time of the BOR hearing, testified that leaving a surveillance location for a long stretch of time, such as 45 minutes, was unreasonable.

7

Courts, and they needed help making an arrest.[6]  Both Riske and Vieillemaringe testified Geoghegan was on the phone when they arrived at the substation.  Riske recalled being told that appellant's informant was monitoring a drug dealer at Imperial Courts and would call with information.  According to Riske, Geoghegan initially said the drugs were in a sprinkler box.  She was on the phone intermittently, and at one point Riske heard her say, "Okay.  It's in a dryer vent," and she then told the officers the drugs were in a "brown bag in the dryer vent."  Based on what he observed and heard at the meeting, Riske concluded Geoghegan learned the location of the drugs from the informant, rather than from personal observation.

The four officers returned to Imperial Courts together, parked their cars, and walked over to the Croesus location.  Consistent with the August 21 report, appellants testified they saw a man on a bicycle hand Golden money, Golden went out of view and returned with what appeared to be drugs.  They heard Riske say, "he's doing a deal right now," and interpreted that to mean Riske had seen the same thing they had.  Geoghegan directed the backup officers to detain the bicyclist, who was riding away, but the officers were unsuccessful and detained Golden instead.  Appellants then retrieved the bag of drugs from the dryer vent of unit 481.

In contrast, Riske testified the only bicyclist he saw appeared to be buying drugs through a mailbox.  Vieillemaringe testified he did not see any bicyclist, but he saw appellants' informant.  That surprised Vieillemaringe because he did not know appellants were using the informant that day.

Geoghegan's phone records show she called the informant five times between 18:58 and 19:09.  She testified it was not her practice to be on the phone during arrests; therefore, she assumed she must have made the calls in the car on the way back to Imperial Courts.  She did not remember why she called, but assumed it was to tell the

---

[6] In his interview with Internal Affairs, Riske confused Nickerson Gardens, a nearby housing project, with Imperial Courts.  He corrected himself off the record after the interview.

8

informant to leave Imperial Courts. Based on her phone records, Geoghegan estimated the officers arrived at the Croesus location around 19:10 and arrested Golden around 9:14, which was 5 to 10 minutes later than the times stated in the arrest report.

Riske testified he saw Geoghegan talking on the phone at the Croesus location, as appellants walked in between two buildings and disappeared out of sight. He assumed Geoghegan was talking to the informant even though he could not hear the conversation. After two to three minutes, appellants returned with a bag of drugs they claimed to have recovered from a dryer vent and said the drugs were Golden's. Riske assumed the informant had linked the drugs to Golden.

At 20:38, the informant called Geoghegan to inquire if he would be paid for the information he had provided. The next day, Geoghegan filled out a secret service funds form, on which she stated the informant "provided information of street sales of narcotics at 11430 Croesus #481 [¶] Golden, Nakia [booking number] [¶] [informant] was paid . . . for information and seizure." Nevertheless, appellants insisted the informant provided no tips about Golden, the dryer vent, or unit 481.

The informant's Internal Affairs interview was introduced at the BOR hearing. The interviewing officer asked the informant if he remembered "an arrest that was made in Imperial . . . where some guy was jamming rock up in a dryer vent," and showed him a photo of Golden to jog his memory. The informant claimed appellants were interested in Marv, a drug dealer also present at the Croesus location, but Golden happened to be there too and was arrested while Marv escaped on a bicycle. The informant stated he had gone to the Croesus location about half an hour before the officers arrived and was keeping appellants apprised of what was going on. He insisted he was mostly paying attention to Marv because that was who appellants were interested in, but also claimed to have told them he knew where Golden hid his drugs.

The informant vaguely identified the hiding places as "in the bushes or like he said in the air conditioner, dryer vent, or something like that," "by the pole or the fence or . . . by the gym," in the weeds, or "behind the gas meter." The informant claimed that he had seen Golden take a customer to "where he had his little stash" and that he had told

9

appellants where the drugs were located. When shown photographs of the area, the informant pointed to "the side down here where the vent is, that's Nokia [*sic*]. The vent, the side of the building, any bushes, or the fence along where the gym field is right here could be Nokia [*sic*] because he—that's where he put his stuff at." The informant agreed with the investigating officer's leading question, "So [to] your knowledge, Nokia [*sic*] stores it in the vent?"[7]

Jody Citizen, a Verizon employee who had testified in over 150 cases, was qualified as a expert on the probability that calls registered to a particular Verizon tower were made from a specific location. Citizen testified that the Verizon network is designed to generally register a cell phone with "the closest tower within a line of sight" during a call. Based on Geoghegan's Verizon phone records, Citizen opined that it was possible, but highly improbable that the calls at 18:05 and 18:06 were made from the Croesus location. Those calls registered to Verizon cell phone tower 29. Tower 29 was located 4.43 miles northwest of the Croesus location, at Western Avenue and 98th Street or Century Boulevard. The tower had a maximum range of no more than 4.5 miles.

It also was unlikely that the call at 18:07, which registered to tower 241, was made from the Croesus location because the tower was located 3.36 miles northwest, at Vermont Avenue and 106th Street. The four calls between 18:09 and 18:12, which registered to tower 322 at South Broadway and 114th Street (2.52 miles west of the Croesus location), were more likely to have been made from the Croesus location. The calls between 18:25 and 19:09 bounced between tower 326, located at 109th Street and Central Avenue (1.23 miles northwest), and tower 328, at 124th Street and Alameda Street (.95 miles southeast of the Croesus location). It was very likely they were made from the area nearest to those towers, including the Croesus location.

Based on Geoghegan's phone records for the afternoon and evening on August 21, Citizen testified that her phone was in the area of towers 322, 326, and 328 from 14:17

---

[7] The informant did not think police officers could conduct surveillance in the projects, but Foreman, the head of the narcotics unit, testified to the effectiveness of appellants' surveillance tactics.

until 17:25; it then registered out of the area to tower 29 during the 18:05 and 18:06 calls, and returned to the area of towers 322, 326, and 328. Citizen opined it was highly unlikely the phone was stationary between 18:05 and 18:14. Instead, it was likely that the phone was moving south toward Imperial Highway and the 105 Freeway, and then east toward the Croesus location.

### D. Evidence Related to Campbell's Arrest

During roll call on September 25, Zambri directed Geoghegan to contact her informant regarding robberies at Nickerson Gardens, and noted the pending contact in his daily log. Geoghegan did not notify Zambri that she had contacted the informant, but that evening Zambri learned she had when Riske related his concerns about the September 25 report. Geoghegan's phone records show calls to the informant at 14:22 and 16:15, and calls from the informant at 15:03 and 15:07. She did not remember what the phone calls were about, but believed the early ones were made pursuant to Zambri's direction to contact the informant.

Appellants followed a lead they received from Senior Lead Officer Roberto Yanez about complaints of narcotics sales in the area of 105th and Compton Streets (the Compton location). They testified they set up an observation post at that location at 16:15, at the time of Geoghegan's last call to the informant. They observed Campbell engage in what appeared to be hand-to-hand drug transactions, during which he retrieved off-white rocks from a box hidden in the driver's side rear wheel well of a car parked across the street from where he sat. After observing a few transactions, appellants decided to call Riske and Vieillemaringe to assist with the arrest.

Geoghegan testified she briefed Vieillemaringe about the situation over the phone and when he arrived.[8] Her phone records show calls to him at 15:09 and 16:37 and a call from him at 16:41. According to appellants, when the backup officers arrived, all four officers approached Campbell. Geoghegan asked Vieillemaringe to help detain Campbell; Byerly asked Riske to help search Campbell's car. Byerly recalled another

---

[8] Geoghegan conceded the September 25 report could be read to mean Riske and Vieillemaringe were present during the surveillance, which would make it inaccurate.

individual was present at the scene, but he did not believe that individual was handcuffed or detained. Appellants denied the informant had anything to do with Campbell's arrest.

Riske testified Geoghegan had told Vieillemaringe over the phone that appellants had an informant at the Compton location and wanted assistance in making an arrest. According to Riske, when he and Vieillemaringe arrived, two men already were in handcuffs, and Geoghegan told Riske "her informant had advised her that one of the males was selling dope from a car and there was a hide-a-key in one of the wheel wells with rock cocaine in it and also under the dash."[9] In the search, Riske found a box hidden in the driver's side rear wheel well, and Byerly found a box in the right front wheel well; a third box was found in the trunk. Campbell was then arrested.

Vieillemaringe recalled handcuffing Campbell, who was standing next to a man already in handcuffs. Vieillemaringe denied having been briefed about appellants' observations.

In an interview with Internal Affairs, Campbell stated he was sitting on a milk crate in the company of his cousin and another man when a black Honda SUV stopped in front of them; two officers exited and detained him and his cousin. A second car arrived shortly after and two male officers exited. After the officers retrieved a box from a car parked across the street, Campbell was placed under arrest.

In his Internal Affairs interview, the informant did not recall helping appellants during the Campbell arrest, nor did he recognize Campbell. The informant described a controlled buy he made for appellants at the Compton location in August 2008, and he mentioned generally that drug dealers in the area hide their drugs in wheel wells.

The defense offered Officer Brian Haggerty's analysis of the informant's cell phone records for September 25 from the Sprint network. Haggerty was a member of the technical support unit, which is able to physically locate phones in use in the field, in real

---

[9] At the BOR, Riske insisted he knew appellants had an informant at the Compton location because he had been present when Zambri told them to send the informant to that area. However, Zambri testified he told appellants to send the informant to Nickerson Gardens.

time.  He acknowledged this is different from deriving the location of a phone from phone records after the fact, but he believed a Sprint engineer would come to the same conclusion he did.  However, Haggerty admitted he had made errors during his analysis, and that he could not find the precise location of the phone, but only the approximate location of the tower it used and the side of the tower that was used.  The BOR sustained the LAPD's objection to Haggerty's expertise and excused him from further testimony.

E. *The BOR and Trial Court Decisions*

The BOR sustained counts 1 through 4 and exonerated appellants on counts 5 and 6.  Specifically, the BOR found the police reports and probable cause declarations were false because appellants had not conducted surveillance before either arrest; the BOR also found they had not notified Zambri of the August 21 contact with the informant.  On the BOR's recommendation, appellants were discharged.

Appellants petitioned the trial court for writ of mandate.  The court concluded the BOR's hearing had been fair.  It reviewed the administrative record independently, and did not defer to the BOR on issues of credibility.  Nevertheless, the court reached the same conclusions as the BOR.

As to the Golden arrest, the court did not credit appellants' version in important respects.  The court questioned why the calls at 18:05 and 18:06 were registered to a tower so far away from the Croesus location and why there were so many calls to the informant between 18:05 and 19:09.  The court rejected appellants' criticism of Citizen's qualifications as an expert.  While it agreed with appellants that Citizen's testimony was consistent with two versions of events—that appellants were at the Croesus location by 18:09 or that they were still traveling—the court noted that "[t]he other evidence" supported the conclusion that appellants did not go to that location before they met with Riske and Vieillemaringe.

The court did not credit Geoghegan's explanation that she called the informant repeatedly to tell him to leave the area, especially considering he was still there at the time of Golden's arrest.  Instead, the court credited the portion of the Internal Affairs interview in which the informant stated he was giving a "blow-by-blow" account of what

13

was happening at the Croesus location.[10]  His statement was supported by Riske's testimony and the payment the informant received.  The court also questioned Geoghegan's explanation that her calls to Vieillemaringe at 18:09 and 18:12 were to inform him that appellants were setting up an observation post because appellants had conducted surveillance at another location during the afternoon without advising Vieillemaringe of their plans.

The court found the 10-minute window between 18:15 and 18:25, around which appellants tailored their BOR testimony, did not give appellants enough time to do all they claimed they did:  drive to the Croesus location, set up surveillance from the car, observe two to three hand-to-hand drug transactions; put on disguise, observe three more transactions on foot, return to the car, and take off the disguise.  The court questioned why the officers would leave the Croesus location, finding their concern that Riske would get lost in the projects to be not credible.

The court noted that the testimony of Riske, and to some extent Vieillemaringe, was inconsistent with appellants' version of events, as both backup officers testified they were not informed of any surveillance, and Riske in particular testified he was told appellants were using an informant.  The court understood the case to turn largely on Riske's credibility, but discounted Riske's alleged motive to lie because Riske had not benefited from reporting appellants.  The court also discounted the discrepancies between Riske's and Vieillemaringe's testimony, noting that the latter's testimony was "circumspect," and did not volunteer information that would aid the case against appellants.

The court acknowledged the evidence of misconduct was not strong with regard to the Campbell arrest, and by itself that arrest might not have been sufficient to make the case against appellants.  Nevertheless, the court once again credited Riske's testimony that Geoghegan had said she was relying on information provided by the informant,

---

[10] The court also believed the informant had given appellants a general idea of the drugs' location.  In all other respects, the court rejected the interview with the informant.

14

which was sufficient to render the report and probable cause declaration false. The court did not consider the failure to pay the informant to be determinative because of the many variables involved in the decision to pay him.

The court credited Zambri's testimony on the issue of notification as to the August 21 contact with the informant. It explained that appellants' logs reflect their contact with the informant but do not establish they notified their supervisor of that contact. Zambri's initials on the logs acknowledge only that an informant was used, not that there was prior notification.

The court concluded appellants had a motive to lie—for convenience and to protect their informant. It upheld the penalty of termination as to both. This appeal followed the entry of judgment denying appellants' petitions.

## DISCUSSION

Code of Civil Procedure section 1094.5 governs judicial review of a final decision by an administrative agency if the law required a hearing, the taking of evidence, and the discretionary determination of facts by the agency. (*Id*., subd. (a).) To overcome the validity of an administrative decision, a petitioner must show the agency acted without or in excess of jurisdiction, did not afford a fair trial, or prejudicially abused its discretion. (*Id*., subd. (b).) "[I]n cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (*Id*., subd. (c).)

Where a fundamental vested right is involved, such as a police officer's right to continued employment, the trial court exercises its independent judgment. (*Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1173.) In doing so, the court may draw its own reasonable inferences from the evidence and make its own credibility determinations. (*Morrison v. Housing Authority of the City of Los Angeles Bd. of Comrs.* (2003) 107 Cal.App.4th 860, 868.) Yet, the court must afford a strong presumption of correctness to the administrative findings, and the party challenging the

15

administrative decision bears the burden of convincing the court that those findings are contrary to the weight of the evidence.  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811–812.)

Where the trial court properly performs its review, its factual determinations are reviewed on appeal under the substantial evidence test.  (*Fukuda v. City of Angels*, *supra*, 20 Cal.4th at p. 824.)  We must resolve all conflicts in favor of the party prevailing in the trial court and give that party the benefit of all reasonable inferences in support of the judgment.  (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 52.)  We are not free to reweigh the evidence or to make independent credibility assessments.  (*Ibid.*)

In reviewing the trial court's determination of the fairness of the hearing process, we review its factual findings for substantial evidence and its conclusions of law de novo.  (*Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 87.)  The determination of expert witnesses' qualifications is reviewed for abuse of discretion.  (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 472; *Cooper v. Board Of Medical Examiners* (1975) 49 Cal.App.3d 931, 946–947.)

I

Appellants argue they were denied a fair hearing because the BOR accepted Citizen's expert testimony about the probability appellants were at the Croesus location at certain times based on Geoghegan's cell phone records for August 21, but did not allow Haggerty to present his analysis based on the informant's cell phone records for September 25.

The trial court rejected appellants' challenge to Citizen's qualifications, which was premised on the facts that he was not an engineer and had no field experience locating cell phones.  The court relied on Citizen's testimony that he had been qualified as an expert in many cases dealing with the coverage of Verizon cell phone towers.  The record indicates Citizen was a records custodian and analyst in the Verizon legal department and had received extensive training on how Verizon records relate to the network, how cell phones operate within the network, and how the network operates.

16

Appellants argue Citizen was not qualified to testify about "granulization theory," and his testimony was unreliable, citing *U.S. v. Evans* (N.D.Ill. 2012) 892 F. Supp.2d 949, 956–957. As to the first point, *U.S. v. Evans* held that a cell phone expert need not be an engineer, so long as he or she has training and experience in how a network operates. (*Id*. at p. 955.) As to the second point, "granulization theory" is not defined in *U.S. v. Evans*, and its precise meaning is unclear. (See *U.S. v. Machado-Erazo* (D.D.C. 2013) 950 F.Supp.2d 49, 57.) The expert testimony in *U.S. v. Evans* involved identification of the angle of specific antennae used at particular cell phone towers to estimate the overlap of the towers' coverage areas. (*Id*. at p. 952.) Although appellants assume Citizen used "granulization theory," the term does not appear in the record. Nor did Citizen's opinion that it was unlikely the calls at 18:05 and 18:06 were made from the Croesus location or that appellants were likely moving between 18:05 and 18:14 depend on the overlap of cell phone tower coverage areas. *U.S. v. Evans* therefore is inapposite. (See *U.S. v. Machado-Erazo* at p. 57 [distinguishing *U.S. v. Evans* on its facts].)

More importantly, appellants argue Citizen's testimony supports an inference favorable to them: that they were in the area of the Croesus location by 18:09. Although the trial court was persuaded that appellants were outside the area immediately before that time, in addressing appellants' criticisms of the BOR's decision, the court agreed with appellants that Citizen's testimony could support an inference in their favor. It declined to draw that inference based on other evidence. In sum, Citizen's testimony is not necessarily determinative of appellants' location, and we do not read the trial court's decision as giving that evidence undue weight.

The trial court found the LAPD objected to Haggerty's lack of expertise based on a series of errors in maps and diagrams he had prepared for the BOR. It concluded that appellants had failed to establish the BOR abused its discretion in excusing Haggerty or prejudiced appellants by doing so.

Haggerty's primary expertise was in tracking phones in real time, which he agreed was a "different science," but he also testified that Sprint engineers would agree with his opinions. Haggerty admitted he could not opine where the informant's phone was during

17

any given phone call, and could only point to the originating and terminating tower and the side of the tower where the phone signal originated. Nor could Haggerty determine where Geoghegan's phone was located, only the tower it was using.

Appellants argue the evidence regarding the informant's location was relevant because it would show if the informant was in a location from which he could have given information about Campbell. They have made no offer of proof whether Haggerty's testimony would have been favorable to them, and in any event, there is no evidence the informant was at the Compton location during any of the phone calls.

Appellants also argue it was unfair to admit Citizen's estimations based on what towers Geoghegan's phone used, but not Haggerty's, just because Haggerty "would not oversimplify the theory to come up with a more definite conclusion." Neither Citizen nor Haggerty could testify to Geoghegan's precise location in the area covered by the towers to which her phone registered during the relevant phone calls. The cell phone tower evidence, therefore, appears to be of marginal significance. Because we next conclude that other substantial evidence supports the trial court's decision, the BOR's decisions with regard to the cell phone expert testimony are not determinative and not prejudicial.

II

Appellants argue the trial court's decision is not supported by substantial evidence. As they note, "'[s]ubstantial evidence . . . is not synonymous with "any" evidence.' Instead, it is ""'substantial' proof of the essentials which the law requires."' [Citations.] The focus is on the quality, rather than the quantity, of the evidence. 'Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial."' [Citation.] Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.] Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' [Citation.]" (*Roddenberry v. Roddenberry* (1996) 44

18

Cal.App.4th 634, 651.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. [Citation.]" (*Id.* at p. 652.)

While appellants' definition of substantial evidence is correct in principle, their application of it to the trial court's findings is unconvincing. As the court recognized, at its core this case turns on weighing the credibility of appellants' testimony that they conducted surveillance and Riske's testimony that they did not. Appellants, however, do not take into account the standard for reviewing witness credibility.

"'[T]he credibility of witnesses is generally a matter for the trier of fact to resolve. Accordingly, the testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.] Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because it contradicts the . . . evidence [supporting the judgment], regardless how "overwhelming" it is claimed to be. [Citation.]' [Citation.]" (*Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1233.)

"'The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying. Hence, the requirement that the improbability must be "inherent," and the falsity apparent "without resorting to inferences or deductions." [Citation.] In other words, the challenged evidence must be improbable '"on its face'" [citation], and thus we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts). The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?' [Citation.]" (*Fuentes v. AutoZone, Inc.*, *supra*, 200 Cal.App.4th at p. 1234.)

### A. Golden's Arrest

As to Golden's arrest on August 21, Riske testified Geoghegan was on the phone when he and Vieillemaringe arrived at the sheriff substation parking lot. She initially said the drugs were in a sprinkler box, but Riske overheard her say on the phone that the drugs were in the dryer vent. Because Geoghegan also said that an informant was

monitoring a drug dealer at Imperial Courts and would call with information, Riske concluded Geoghegan learned the location of the drugs from the informant, rather than from personal observation. Riske also saw Geoghegan on the phone when appellants went to retrieve the drugs at the Croesus location, and assumed she was talking to the informant again.

There is nothing inherently improbable about Riske's testimony. His conclusions are reasonably based on what he testified he saw and heard, and they are corroborated by Geoghegan's phone records, which show she made eight calls to the informant between 18:31 and 19:09, a time period that included the meeting at the sheriff's substation and the return to the Croesus location. Riske was justified in concluding that Geoghegan was on the phone with the informant since her records show she called no one else during that period of time. Because Geoghegan corrected her initial statement about the location of the drugs while on the phone with the informant, it was reasonable to conclude that she received information about that location from the informant. Riske's conclusion that the informant tipped off appellants about drugs in the dryer vent at unit 481 also matches the description of the informant's involvement in Golden's arrest that Geoghegan included on the secret service funds form for paying the informant.

Appellants claim Riske conceded that they could have conducted surveillance on Golden before meeting the backup officers and that he did not know whether they had done so. Those concessions do not change the fact that Riske believed appellants had not conducted surveillance, nor do they undermine the reasonableness of his belief that Geoghegan received information about the location of the drugs over the phone.

Appellants argue Riske's testimony is unreliable because at one point he confused the Imperial Court and Nickerson Gardens housing projects, and because it was contradicted by Vieillemaringe and the informant. So long as Riske's testimony is not inherently improbable, it may not be rejected on appeal, even if it is contradicted and "subject to justifiable suspicion." That is because weighing its credibility is within the exclusive province of the trial court. (*Fuentes v. AutoZone, Inc.*, *supra*, 200 Cal.App.4th at p. 1233.)

20

Vieillemaringe denied hearing about the informant and was surprised to see him at the scene. Vieillemaringe's proclaimed ignorance of appellants' use of an informant on August 21 is suspect in light of the undisputed fact that Geoghegan was in contact with the informant throughout the evening. The trial court questioned Vieillemaringe's willingness to volunteer information that would aid appellants' prosecution, noting that he was "circumspect in his testimony." Moreover, even Vieillemaringe corroborated Riske's testimony in important respects: he, too, had seen Geoghegan on the phone when the four officers met at the sheriff's substation; and he, too, denied having been briefed on appellants' personal observations. Appellants argue it is not unusual for officers not to brief their colleagues that they had set up an observation post. That argument misses the point because Geoghegan testified it was appellants' practice to relay their observations to the backup officers.

Appellants claim Riske's testimony is contradicted by the informant, who insisted he relayed information about Big Marv. Appellants cite the informant's repeated statements to that effect, as well as his initial inability to remember the Golden arrest. They quote out of context the informant's statement that he did not see the drugs in the dryer vent, and rely on the investigating officer's conclusion that the informant could not have seen the dryer vent from where he stood. They also find significant the absence of any evidence about sprinkler boxes in the area.

The court relied on the informant's interview to corroborate other evidence that the informant was at the Croesus location, apprised appellants of the ongoing drug activity there, and gave them a general idea of where Golden hid his drugs. The informant stated that he gave appellants information about what was going on at the Croesus location in general, including information about Golden. When shown photos of unit 481, the informant claimed to have seen "them going reaching down there. . . . I happened to turn the corner a few times while they were bending down . . . and actually see," and he pointed to various places where Marv and Golden would hide their drugs.

Whether or not there are sprinkler boxes in the Imperial Court housing project is beside the point because the accuracy of the originally reported location is not at issue.

21

Nor is it necessary for the informant to have seen Golden remove drugs from the dryer vent on the day in question. Appellants argue that if they did not know where the drugs were located, they could not have arrested Golden. But according to the arrest report, Golden was arrested after appellants recovered the drugs, and it is not unreasonable to conclude that the report was intentionally written the way it was to cover up the lack of reliable information regarding the location of the drugs.

Appellants challenge discrete sentences from the trial court's decision, without regard to their relative importance. They claim variously that the court speculated as to their location at certain times, reached illogical conclusions, did not draw from the evidence inferences favorable to appellants, and did not resolve conflicts to appellants' satisfaction. They also quote random statements the court made during the hearing. None of these arguments compels a change in the result.

The court's attempt to construct a "correct version" of events was unnecessary, whether or not it is accurate in its minor details, which is what appellants principally attack. It is sufficient that the court determined that appellants' version of events was not credible. The court's attempt to track appellants' movements based on Citizen's testimony and its comments about appellants' location at various times during the day also were unnecessary. On the only relevant issue—whether respondents were at the Croesus location by 18:09, the court agreed the cell phone expert's testimony supported two different inferences: that they were, and that they were not. The court concluded that other evidence supported the latter inference.

Appellants argue it is highly unlikely Geoghegan would have requested assistance before appellants verified the information they received. But that begs the question whether appellants verified the informant's tip and hence requires an inference in their favor; the contrary inference—that appellants proceeded without verifying the tip, which is supported by Riske's testimony—is neither unreasonable, nor improbable. Nor is it unreasonable for the trial court to question appellants' stated reason for meeting the backup officers at the sheriff's substation. The concern that Riske would be lost in the

22

projects does not appear to justify leaving an observation post for 45 minutes, a strategy that Foreman, the new unit chief, questioned as well.

Appellants complain about various statements the trial judge made at the hearing: that he watched "cop shows"; that he had not read the complete record, specifically Foreman's testimony; that he speculated the informant "probably does drugs himself" and appellants arrested Golden because Big Marv ran away. None of the comments of which appellants complain appears in the final written decision. In a section addressing appellants' criticisms, the decision specifically credits Foreman's testimony about appellants' ability to conduct surveillance in the projects. At the hearing, the judge commented: "I watch cop shows. They tell me to look for motive. What's the motive here?" Appellants take the "cop show" comment out of context. The comment was made facetiously and only in relation to appellants' motive to falsify the reports. It is far-fetched to conclude from this comment, as appellants do, that the court played "television detective instead of confining its findings to facts set forth in the record."

### B. Campbell's Arrest

The trial court doubted that the evidence regarding the September 25 arrest of Campbell was sufficient by itself to support appellants' discharge because it was less clear whether appellants had failed to conduct surveillance on that day. But the court concluded that because Riske's testimony regarding appellants' reliance on an informant for the Golden arrest was credible, his statement that Geoghegan told him she relied on an informant for the Campbell arrest also should be credited.

Appellants argue the court improperly bootstrapped its findings on the Campbell arrest to those on the Golden arrest since there was no evidence corroborating Riske's belief that appellants relied on an informant for the Campbell arrest. Indeed, the evidence shows Riske mistakenly believed Zambri had directed appellants to send the informant to the Compton location, whereas Zambri testified he directed appellants to send the informant to Nickerson Gardens. The informant did not corroborate his participation in Campbell's arrest, nor was he paid for providing any information relevant to that arrest. While there were several phone calls between the informant and Geoghegan on that day,

23

it is unclear that any of them was related to drug activity at the Compton location. Vieillemaringe testified that neither appellant told him they were using an informant, which was contrary to Riske's testimony that Geoghegan reportedly did so during the call to Vieillemaringe.

That said, we do not conclude Riske's testimony that Geoghegan told him "her informant had advised her that one of the [detained] males was selling dope from a car and there was a hide-a-key in one of the wheel wells with rock cocaine in it and also under the dash" was inherently improbable on its face—that is, without comparing it to other evidence and without resorting to inferences and deductions. (*Fuentes v. AutoZone, Inc.*, *supra*, 200 Cal.App.4th at p. 1234.) Furthermore, the trial court could disbelieve appellants' testimony as a whole after having concluded they falsified the Golden arrest report. (*Gargir v. B'Nei Akiva* (1998) 66 Cal.App.4th 1269, 1277 [trier of fact may entirely distrust testimony of witness believed to have testified falsely on material issue].)

Appellants repeatedly cite the District Attorney's discretionary decision not to prosecute them criminally, specifically over a concern about Riske's credibility. That different agencies, under different standards of proof, may weigh the evidence and witness credibility differently does not mean that, on appeal, we are free to reweigh the evidence and redetermine credibility. On the contrary, under the substantial evidence test, "'[a]ll of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed. [Citation.]'" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 866.)

*C. Notification of Zambri*

LAPD officers are required to notify their supervisor of calls to or from an informant. The trial court found no evidence that appellants notified Zambri of their contact with the informant on August 21. Appellants ask us to reweigh credibility as to this finding as well. We decline to do so.

24

The trial court credited Zambri's testimony that if appellants had notified him he would have recorded the notification in his daily report. Appellants rely on their daily logs, but the logs show only contact with the informant, not supervisor notification. As Zambri explained at the BOR hearing, his initials on the logs more than a month later do not establish contemporary notification, as he assumed such a notification occurred without checking his log.

We conclude that the trial court's decision is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

25